IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JATAVIOUS WEBSTER,

                Plaintiff,                OPINION AND ORDER

v.

                                   22-cv-353-wmc

BARRY DAUGHTRY, MICHAEL BROWN,
TAMMY STRUMNESS,
and CHRISTOPHER RAUCH,

                Defendants.

      Plaintiff Jatavious Webster is currently incarcerated at New Lisbon Correctional Institution ("New Lisbon") and representing himself in this lawsuit against dentists Christopher Rauch and Michael Brown, health services unit manager ("HSMU") Tammy Strumness, and Dr. Barry Daughtry. The court previously granted Webster leave to proceed against these defendants on Eighth Amendment deliberate indifference claims (dkt. #7), and defendants have since moved for summary judgment. (Dkt. ##36, 53.) Because the evidence at summary judgment would not permit a reasonable trier-of-fact to conclude that defendants Rauch, Brown, Strumness, and Daughtry were deliberately indifferent to Webster's persistent mouth numbness and pain, the court will grant defendants' motions.

UNDISPUTED FACTS[1]

**A. Background**

At all relevant times, Webster was an inmate at New Lisbon, and defendants Brown, Rauch and Strumness were all employed by the Wisconsin Department of Corrections ("DOC") and worked at New Lisbon as dentists and HSMU, respectively. In addition, defendant Daughtry was a medical doctor contracted by the DOC to see patients at New Lisbon. As HSU manager, Strumness could not prescribe medications, but she could provide non-prescription medications like Tylenol. Strumness did not see or treat Webster for his dental condition.

In September 2021, Webster saw Dr. Rauch for a tooth filling, during which he administered a numbing shot. According to Angelo Panos, a dentist and the Dental Director of the DOC, it is common to give local anesthesia injections for comfort, and it is "not uncommon" to have temporary numbness after dental work, but the risk for permanent nerve injury is rare, and nerve injuries usually resolve on their own.[2] (Panos

---

[1] Unless otherwise noted, the following facts are undisputed as drawn from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support. In particular, plaintiff Webster did not respond to each of Dr. Daughtry's proposed findings of fact. Thus, the court will deem those proposed findings of fact undisputed, except where Webster's own proposed findings of fact or evidence contradicts Daughtry's version of events. In addition, Webster objects to several of the other defendants' proposed findings of fact, but many of his responses cite to no specific evidence. Thus, Webster's improper objections are overruled unless otherwise noted and his responses ignored unless supported by evidence of record or reasonable inferences from that evidence when viewed in a light most favorable to plaintiff as the non-movant. *See Proc. to be Followed on Mot. For Summ. Judg.*, § II(C), (E); *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2011) (courts are to consider only evidence set forth in proposed findings of fact with proper citation).

[2] Webster disputes the rarity of permanent nerve injury, and the court addresses the dispute in the Opinion section below.

Decl. (dkt. #56) ¶¶ 9-10.)  Because the risk of nerve injury is very rare, it is also a minor consideration in deciding how to numb teeth.  (*Id.* ¶ 11.)

### B. Treatment for Persistent Numbness

About one month later, at an October 2021 appointment with Dr. Brown, Webster reported that feeling in the left side of his mouth had largely returned but the left side of his tongue and floor of his mouth remained numb.  However, Webster reported no pain and there was no evidence of tongue biting.  Thus, Brown diagnosed him with "left lingual nerve partial paresthesia," explaining that his condition might be temporary.  At that time, Brown advised that Webster could wait and see if the numbness resolved, or he could see an oral surgeon.  Webster chose the oral surgery referral, which Brown initiated by referring him to oral surgery at Gundersen Health and prescribing him a steroid called methylprednisolone to stimulate nerve healing.

On October 15, Webster submitted a health service request ("HSR") stating that he had pain in the left side of his face, and the methylprednisolone was not working.  (Defs.' Ex. 1000 (dkt. #59-1) 20.)  During a screening nursing visit the next day, it was noted that there was no redness, drainage or disturbance in his speech, and Webster reported eating and drinking.  Nevertheless, the nurse forwarded his complaint to the dental department.

On October 26, Webster saw Dr. Yu Wen Lin at Gundersen Health for a surgical consultation, reporting persistent numbness with only slight improvement.  By that point, he also reported difficulty eating and tongue biting, but denied pain, fever, chills, swelling, difficulty opening his mouth, or swallowing.  Upon examination, Dr. Lin did note that

Webster was unable to distinguish dull and sharp sensations on the left side of his tongue. Although recommending no additional treatment, Dr. Lin suggested following up in a few months, and if there was no improvement by that time, to consider a neurosurgical referral.

The day after his appointment with Dr. Lin, a nurse also saw Webster after he reported biting his tongue. That nurse noted some irritation on the left side of Webster's tongue, gave him ibuprofen and Tylenol, and forwarded the issue to the dental department. Dr. Brown saw Webster the following day, October 28, and noted a three-millimeter abrasion on his tongue and pain in the area. While Dr. Brown recommended a soft or blended diet, Webster refused. Webster also reported pain and a "pins and needles" sensation after he started taking methylprednisolone, and expressed anxiety about continuing to take that drug. (Webster Decl. (dkt. #67) ¶¶ 7-8.) On Dr. Brown's advice, Webster reluctantly agreed to have another round of steroids and wait for a follow-up appointment with the oral surgeon. (*Id.* ¶ 8.) At that time, Dr. Brown also prescribed Webster a multivitamin. (Defs.' Ex. 1000 (dkt. #59-1) 12.) When the steroid apparently did not work, Dr. Brown ordered the oral surgery consultation, while Dr. Daughtry prescribed Webster ibuprofen to address his symptoms further.

At a November 30, 2021, appointment with Dr. Lin, about one month after their first appointment, Webster reported a constant burning sensation in his tongue and tongue biting, although Lin detected no visible abrasions from tongue biting. While Lin again found that Webster could not distinguish between dull and sharp sensations, Webster still denied pain, chills, swelling, or difficulty opening his mouth or swallowing. Thus, Lin

concluded that there was nothing more he could do, except recommending a neurosurgical referral to Mayo Clinic.

After this second off-site appointment with Dr. Lin, it could take a few weeks for New Lisbon providers to receive the corresponding treatment notes. Here, Dr. Lin's notes from Webster's second appointment were stamped as received by New Lisbon on January 7, 2022, some five weeks after Lin saw Webster. (Defs.' Ex. 1001 (dkt. #59-2) 67-68.) Specifically, Lin had completed an "Off-Site Service Request and Report" on November 30, 2021, the same day he saw Webster, while Dr. Daughtry wrote a note at the bottom referring to Lin's "Referral to Mayo Oral Surgery. B.D. 1-7-2022," apparently the same day he had received this referral. (Daughtry Ex. A (dkt. #39-1) 63.)

Some forty days later, on February 17, 2022, Webster submitted a follow-up HSR asking, "Am I going to need surgery for my left lingual nerve? Or [are] there other treatment options? Can you please let me know what[']s going on[?]" (Defs.' Ex. 1001 (dkt. #59-2) 128.) The next day, HSU Manager Strumness responded that his appointment was being scheduled. (*Id.*) Also, on an unspecified date, she compiled Webster's treatment records for the institution complaint manager.

In March 2022, Webster saw an oral surgeon at Mayo Clinic and reported that his mouth had become less numb, but he still lacked feeling, pain, taste, and touch, as well as occasionally bit his tongue. The Mayo surgeon also noted that Webster felt no pain or touch on the left side of his tongue and that everything else was normal. Because the surgeon suspected that Webster had a "chemotoxic" nerve injury, rather that a direct surgical injury, he did not recommend surgery, explaining that recovery would be "the

5

product of his own healing," which could take six months to one year to heal.  (Defs.' Ex. 1003 (dkt #59-4) 11.)  The surgeon imparted the importance of adequate nutrition and taking vitamins.  (*Id.*)  Finally, the surgeon noted that Webster's medical records were unavailable, and he planned to follow-up with Webster in six months.  (*Id.* at 10.)

At that follow-up Mayo Clinic appointment in September 2022, Webster reported his symptoms were unimproved, and he still had no sensation in the left side of his tongue.  At that time, the surgeon noted, "we are still hopeful he will have improvement in symptoms due to the slow healing of nerves as well as the adaptability of the brain to perceive sensation from the right tongue."  (*Id.* at 8.)  However, he did not recommend surgery or any other additional treatment, noting that no follow-up was necessary.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (alteration adopted and quotation marks omitted).  At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017).

The Eighth Amendment gives prisoners the right to receive adequate medical care.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical

condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). Defendants essentially concede that plaintiff's mouth numbness and pain constitutes a serious medical condition, at least at summary judgment. Instead, they focus their arguments on plaintiff's failure to offer proof from which a reasonable jury could find deliberate indifference as to any defendant. The court agrees.

"Deliberate indifference" generally requires proof that a government actor was aware a prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* negligent acts, or even grossly negligent acts, although it requires something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). At summary judgment, the threshold for deliberate indifference is met where, among other situations, plaintiff has evidence that "the official knows of and disregards an excessive risk to inmate health or safety." *Id*. at 837.

Because these defendants are medical professionals, the relevant question under the Eighth Amendment is whether their actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996). Moreover, the court is to examine the totality of an inmate's care in determining whether prison officials have been deliberately indifferent to an inmate's serious medical need. *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000). As set forth above, nothing in plaintiff's treatment even supports a finding of

7

medical malpractice or negligence by any of the defendants, much less deliberate indifference.

## I. Dentists Rauch and Brown

To begin, Dr. Rauch asserts that he appropriately administered numbing shots during plaintiff's procedure given that the risk of harm from such shots is low and permanent nerve injury is rare. Plaintiff responds that a study published in the Journal of the American Dental Association ("JADA") found that the lingual nerve sustained damage after numbing shots in a high percentage of cases which shows that Rauch should have known that there was a high risk of nerve damage when he administered those shots. (Webster Ex. 2 (dkt. #67-1).) However, even if this were a sufficient basis to find Rauch negligent for his choice or administration of those shots, on this record, there is *no* basis for a reasonable jury to find Dr. Rauch acted with deliberate indifference for following what the evidence establishes is still a common dental practice, particularly when that same evidence shows such shots posed little risk of *permanent* nerve damage.[3] (Panos Decl. (dkt. #56) ¶ 9-10); *see Estate of Cole by Pardue*, 94 F.3d at 261-62.

More specifically, plaintiff asserts that the numbing shots *did* pose a high risk of nerve injury, again citing to the JADA article, but that article confirms permanent nerve damage is a "documented but very rare complication" from a numbing shot, estimating the

---

[3] Defendants argue that plaintiff's claim against Dr. Rauch is precluded, as he previously sued Rauch for the same events at issue in this case in state court, and his state court case was dismissed at summary judgment. (Defs.' Reply Br. (dkt. #68) 3-4.) While persuasive, the court need not address this alternative argument as summary judgment is appropriate on the merits.

8

risk as between 1 in 26,762 and 1 in 160,571. (Webster Ex. 2 (dkt. #67-1).) Plaintiff also asserts that Dr. Rauch was negligent because he lacked the certificate necessary to administer local anesthesia, but that, too, is not enough to show deliberate indifference. *Farmer*, 511 U.S. at 836 (deliberate indifference requires more than negligence, or even gross negligence).[4]

As for Dr. Brown's treatment of plaintiff's lingering condition following the initial dental procedure by Dr. Rauch, the evidence shows Brown promptly examined him, referred him to specialists, prescribed pain relievers and steroids, and offered a soft-food diet. Moreover, nothing in the record even suggests that this course of treatment was inappropriate. Indeed, the latter treatment plaintiff received from the specialists establishes that plaintiff's condition required no further treatment. While plaintiff responds that Dr. Brown acted with deliberate indifference in placing another order for methylprednisolone despite plaintiff complaining that the drug was not working and causing pain and a "pins and needles" sensation, he offers nothing that would allow a reasonable jury to find this outside the exercise of medical judgment, especially given the likelihood that plaintiff's condition would resolve naturally *and* Brown's readiness to involve experts to second guess his approach.

Certainly, a doctor can be deliberately indifferent by persisting with a course of treatment that he knew to be ineffective. *Goodloe*, 947 F.3d at 1031. However, plaintiff's evidence shows that Dr. Brown considered his "pins and needles" sensation evidence that

---

[4] Plaintiff also points out that Dr. Rauch did not submit a declaration as promised in defendants' expert disclosures, but that does not preclude entry of summary judgment in Dr. Rauch's favor.

9

the steroid injection was actually helping plaintiff's nerve regenerate. (Dr. Brown Interrogatory (dkt. #67-3) 1.) To be sure, there is at least some evidence that Dr. Brown's decision to continue prescribing plaintiff methylprednisolone was inappropriate. For example, Dr. Lin had indicated days earlier that there was no "utility" for a steroid; and plaintiff told Dr. Brown that methylprednisolone was causing him pain. (Defs.' Ex. 1002 (dkt. #59-3) 3); Webster Decl. (dkt. #67) ¶ 8.) Even so, Dr. Brown's single decision to prescribe plaintiff a second course of methylprednisolone does *not* support a finding that he was deliberately indifferent, when Dr. Brown also twice referred plaintiff to an oral surgeon, recommended a soft or liquid diet, and prescribed him a multivitamin and other providers gave him over-the-counter pain medications. *See Walker*, 233 F.3d at 501 (courts consider totality of inmate's care); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016) (a single negligent act cannot support an inference of deliberate indifference, while persistence in a course of action known to be ineffective can).

Finally, plaintiff also appears to fault Dr. Brown for waiting 13 days to see him after he complained in an HSR that the steroid was not working and causing him pain, but he provides no evidence that Dr. Brown was responsible for the delay. Further, in the 13 days between plaintiff's HSR and his appointment with Dr. Brown, he had two other appointments with a nurse *and* an offsite appointment with an oral surgeon.

## II. Dr. Daughtry

Next, the evidence of record shows that Dr. Daughtry referred plaintiff for oral surgery as soon as he received Dr. Lin's recommendation on January 7, 2022. Further, to the extent there was a delay between Daughtry's January 2022 endorsement of Lin's

10

recommendation to involve a specialist and plaintiff's actual March 2022 Mayo Clinic visit (or for determining what records would be sent to Mayo Clinic for plaintiff's appointment), there is *zero* evidence that this was in any way attributable to Daughtry.  Finally, Daughtry persuasively points out that there is no basis for a reasonable jury to find any delay harmed plaintiff as his symptoms from lingering numbness after a dental procedure were being treated, and the Mayo Clinic surgeon concluded that six more months of monitoring was needed before surgery could even be considered, then concluded again six months later that a surgical intervention was not indicated, but rather that additional time was plaintiff's best hope for a full recovery.

Plaintiff responds that Dr. Lin's note about referring plaintiff to Mayo Clinic was really forwarded to Dr. Daughtry on November 30, 2021, and Dr. Daughtry was deliberately indifferent by ignoring Dr. Lin's recommendation for weeks.  Certainly, an "[i]nexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference.  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quotation marks omitted).  However, in circumstances where medical care is delayed, the Seventh Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm."  *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)); *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (a delay in treatment only constitutes deliberate indifference where a plaintiff presents independent evidence that the delay exacerbated an injury or prolonged his pain).  Here, all the evidence is to the contrary.

Thus, Dr. Daughtry is entitled to summary judgment for three reasons. First, the evidence shows that Dr. Daughtry was not responsible for plaintiff's delayed referral, as it is undisputed a few weeks delay is standard for an offsite provider's notes, like Dr. Lin's, to reach New Lisbon providers, and Dr. Lin's notes were stamped as received by New Lisbon on January 7, 2022 -- the very same day that Daughtry immediately referred plaintiff to Mayo Clinic. (Defs.' Ex. 1001 (dkt. #59-2) 67-68.) In fairness to plaintiff, a nurse's November 30 notes from his offsite return examination state that "paperwork was forward[ed] to MD" (Webster Ex. F (dkt. #35-7) 1), but there is no evidence that "paperwork" referred to Dr. Lin's notes, nor that "MD" referred to Daughtry.[5]

Second, even if Dr. Daughtry was responsible for some of the delay in plaintiff's referral to Mayo Clinic over the holidays, there is zero evidence on this record that any delay caused him harm. As noted at plaintiff's March 2022 appointment at Mayo Clinic, the surgeon noted that it could take six months to one year for plaintiff's mouth to heal, explaining that his recovery would be "the product of his own healing." (Defs.' Ex. 1003 (dkt #59-4) 11.) In the meantime, the Mayo Clinic doctor recommended adequate nutrition and vitamins, and Dr. Daughtry and other providers at New Lisbon had already recommended a soft diet and a multivitamin. *Walker*, 233 F.3d at 501. While plaintiff also asserts that the delay somehow prolonged his pain and suffering -- and his condition was undoubtedly uncomfortable and painful -- he has not offered evidence from which a

---

[5] Plaintiff makes much of the fact that the off-site service request and report has a section that states, "Do: Dictate from Recommendations," asserting that language required Dr. Daughtry to act on Dr. Lin's recommendations. (Daughtry Ex. A (dkt. #39-1) 63.) However, that language was directed to off-site providers, not Dr. Daughtry, as that section also warns not to inform patients of upcoming appoints or prescribed comfort measures unrelated to his or her specialty. (*See id.*)

12

reasonable jury could find that any *delay* -- rather than his mouth condition -- caused his pain and suffering. On the contrary, the Mayo Clinic surgeon ultimately recommended delay, that is to say, waiting to see if the natural healing process would resolve his remaining numbness and pain. *Walker*, 940 F.3d at 964.

Third, and finally, plaintiff provides no evidence that *Dr. Daughtry* was in any way responsible for sending the wrong records to Mayo Clinic or that any error amounted to more than negligence, which is not enough for a jury to find deliberate indifference. *Farmer*, 511 U.S. at 836. Accordingly, defendant Daughtry is entitled to summary judgment.

### III. HSU Manager Strumness

As for defendant Strumness, she argues that there is no evidence of her personal involvement in plaintiff's medical and dental care at all. Rather, the only evidence shows Strumness responded to one of plaintiff's relevant HSRs and provided plaintiff's treatment records to an institution complaint examiner without substantively reviewing them. While plaintiff alleges generally that Strumness disregarded his pain and suffering, "[f]or a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).

Contrary to plaintiff's assertion, there is no evidence that Strumness disregarded plaintiff's pain and suffering. Instead, Strumness responded to one HSR and one dental service request ("DSR"), but respectively, those requests were only for an update on his possible need for mouth surgery and for a copy of his x-rays. (Defs.' Ex. 1000 (dkt. #59-1) 49; Defs' Ex. 1001 (dkt. #59-2) 128.) Plaintiff also asserts that Strumness reviewed

various other HSRs and DSRs, but he only appears to have *addressed* some of his other requests to her, while a different staff member actually responded to those requests. (Defs.' Ex. 1000 (dkt. #59-1) 46; Defs.' Ex. 1001 (dkt #59-2) 127, 129-30.)[6]

Moreover, even if Strumness somehow deficiently responded to the few HSRs and DSRs that came to her attention, the evidence shows that plaintiff was consistently in the care of other advanced medical providers and any delay attributable to her did not prolong his pain and suffering for the reasons already explained above. Accordingly, defendant Strumness is also entitled to summary judgment in her favor.

ORDER

IT IS ORDERED that:

1) Defendant Daughtry's motion for summary judgment (dkt. #36) is GRANTED.

2) Defendants Rauch's, Brown's, and Strumness's motion for summary judgment (dkt. #53) is GRANTED.

3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 30th day of September, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[6] Given that the court is granting defendants' motions for summary judgment, the court need not address their qualified immunity arguments.